THE ROME HOTEL CO. *v.* WARLICK, WINGATE & MELL.

1. The plaintiffs claiming a lien for work and material specified in written contract, and for extra work and material for which there was no written contract and no agreed price, and the parties differing in their testimony as to what this price should be, that the verdict awards for the extra work less than is claimed is not cause for arresting the judgment on the ground that the verdict shows that the plaintiffs did not fully comply with their contract and were not, therefore, entitled to a lien. (R.)

2. Where the judge charges upon an issue as to the contract made in the evidence and first brought out on the cross-examination of a witness for the plaintiffs, there being no objection to the testimony and no motion to exclude it, the defendant cannot complain of the charge on the ground that parol testimony will not be received to vary a written contract and that the matter to which this evidence relates was merged in the writing. (R.)

3. Where it did not appear that when a contractor, mechanic or material-man quit the work he engaged to do, the other party had failed or refused to make any payment when due, such stopping of the work before compliance with the contract, upon a mere apprehension or fear that he would not be paid at the time for payment, was unauthorized and defeated a claim of lien. The plaintiffs having failed to complete their contract as to the extra work, simply on account of the fear that they would receive no compensation therefor, they are not entitled to a lien for so much of the extra work as they have done, but as to such work are merely entitled to a general judgment upon a *quantum meruit;* and this only because the defendant received the benefit of the work. So far as the verdict sets up a special lien for this extra work, it is erroneous, and to that extent the lien should be discharged. (R.)

4. The evidence being conflicting, the discretion of the trial judge in denying a new trial over the general grounds of the motion therefor, will not be disturbed. (R.)

March 30, 1891.

Liens. Judgments. Contracts. Evidence. Charge of court. Verdict. Practice. Before Judge MADDOX. Floyd superior court. March term, 1890.

Warlick, Wingate & Mell sued the Rome Hotel Company on account for $2,691.63, a balance claimed to be due them for work and labor done and materials furnished on and in building the hotel of defendant, and

in doing plumbing, gas-fitting and other work thereon ; and also to declare and set up a lien on the hotel building and grounds, for such balance. The defendant pleaded not indebted. Also, that the account was unjust, and the work negligently and unskilfully done and with inferior and defective material, damaging it in the sum of $3,000 ; that a steam-heating system, one of the principal items in the account, was so negligently done that it failed to heat the hotel arcade, parlors and dining-room, so that coal had to be used during the winter, and the steam-heating was of no value and its defects had damaged the hotel $1,000, etc.   The principal matter in dispute between the parties was as to the steam-heating system, which, together with certain other work, was originally contracted for, and extra work done by plaintiffs for defendant.

The evidence for plaintiffs tended to show the following :   On March 22, 1888, the plaintiffs made a written proposition to defendant to furnish a Florida boiler with necessary pipes, radiators, etc., to complete the system of steam-heating in the hotel, guaranteeing to heat the arcade, parlors and dining-room, in the coldest weather, to seventy degrees Fahrenheit, for the sum of $1,454.   The writing also contained propositions for certain other work not necessary to be here mentioned, except that the plaintiffs proposed to furnish hot and cold water for wash-basins and bath-tubs.   It was expressly understood between the parties before the contract, as stated in the writing, was closed, that the hotel halls were not to be included in the heating system, but were to be closed up with storm-doors, or curtains, or in some similar way ; it was expressly understood that plaintiffs were to do nothing towards heating the halls; this was an oral understanding. These halls opened upon the arcade.   The plaintiffs, in accordance with the contract, put in a Florida boiler with the necessary

pipes, radiators, etc., to complete the system of steam-heating. If properly managed, the boiler, radiators, etc., as put in by them, were more than sufficient to produce the degree of heat stipulated for in the hotel arcade, parlors and dining-room, but were not sufficient to heat the halls, or to produce the degree of heat contracted for, the halls being left open. Defendant did not properly manage the boiler and did not use the proper kind of coal or coke, so that the heat obtained was not at all times such as it should have obtained, and so that grates in the boiler were negligently burned out. The boiler when properly supplied with coal or coke of the right quality and left in proper condition in the morning, would not require further attention more than once during the day, or probably not until night. It was simple and easily operated and did not require a person of more than ordinary intelligence to attend to it. It was economical, valuable and furnished a first-class system of heating. Anthracite coal or good gas coke was the proper fuel to use in the boiler. A pamphlet setting forth the claims made by the manufacturers of the Florida boiler was exhibited by plaintiffs to defendant. It was represented to defendant to be one of the most economical heating apparatuses known to science. As a portion of the heating apparatus, plaintiffs were to furnish radiators. Radiators were furnished, and in order to do their work properly they ought not to leak, but it is not absolutely necessary to their heating power that they should not leak; they can heat and still leak, and frequently do so. They are constructed with automatic valves, but require to be set of course, regulated by hand, and then work automatically, but of course require some attention. They were not properly attended to by defendant, so as to obtain from them the amount of heat which could have been obtained by proper attention. If they leaked, the leaks

were not important; and one leak, insisted upon as quite serious by defendant, the attention of plaintiffs had not been called to up to the time of the trial. If a sufficient quantity of hot water was not obtained by defendant, it was because defendant neglected to put in hot water boilers of sufficient capacity. The putting in of such boilers was not a part of the contract with plaintiffs. The charges for the extra work were fair and reasonable, and that work was properly done. No definite sum for this work had been agreed upon, but it was agreed that it should be done for a reasonable price. Defendant several times complained about the inefficiency of the heating apparatus, and plaintiffs did not complain that the halls were not closed and never demanded that the halls should be closed up; that was left with defendant. When the Florida boiler was properly run in the hotel, it made plenty of heat and burned out no grate-bars. The work which plaintiffs did was concluded within ninety days of the time their claim of lien was filed and recorded, and their suit was brought within twelve months from the time their claim became due. The work was done and material furnished by them as plumbers, steam and gas-fitters. Plaintiffs did not get to finish everything connected with the extra work which was to have been done, on account of the fact that they had done about all they could get any money for; there was some work that might have been put in if the money had held out; a tank on top of the house and a little steam table (which are not charged in the account sued on) might have been put in, if the money had held out; plaintiffs quit work because the money gave out; that was not on the regular work, but on the extra work where they were paid by the day. The tank has been put in by defendant since, and was not necessary to complete the job properly, if defendant would run its elevator right. Plaintiffs quit because

they were afraid about their money; they had finished up about what they had to do there, and stopped because they were apprehensive about money matters. When the radiators were full of cold air, before hot air was to be forced into them, it was proper that they should be to some extent open to permit the cold air to escape, and when the valves were open, when first heated up, a little water would come out of them, but they are not continually leaking and water running down through the floors; if they do leak and run down through the dining-room, it never was reported. A witness for plaintiffs, who was overseeing the job for them, was in the hotel and looked over everything time and again when one Jewell was in charge, and there was no leak there then. If hot water, after the completion of the building, ran up into the pipes for a month all right, and afterwards did not, and after that two additional heaters were put in the kitchen and one in the barber-shop, and after that the water went back through the pipes, one of the plaintiffs' witnesses testified that he would say that was a good job, but he did not know whether the water system of the barber-shop was connected with the house or not. If the boilers for the storage of hot water were just the same now as they were before, and when first completed did not supply hot water but do now, there was something wrong about it, but the entire job of plumbing should not be condemned on that account, as there might be a stop in it or a leak, or some such thing, etc. When one King was in charge of the hotel for defendant (and King, from the evidence, seems to have been generally in charge of it as the agent or representative of the defendant), any little imperfection about the work, which he called plaintiffs' attention to, was corrected. He never called attention to the leak in the dining-room. Storm-doors for the halls were not contemplated in the plan of the house, but it

is possible to put them in. If a system of heating the hotel applied to the whole hotel, it would apply to the halls as well as the arcade, parlors and dining-room; and one of plaintiffs' witnesses testified that he never saw a system of heating a hotel that applied to heating up nothing but the arcade, parlors and dining-room, that he knew of. The valves of the radiators furnished by plaintiffs are automatic, but such valves will not remain so, even if they are properly set, though it is claimed that they will. They have.to be watched, noticed occasionally. When the metal has been expanded by heat, it will not come exactly back to its place when it contracts, and by a small fraction therefore these valves will be inclined to open, and should be turned sufficiently to adjust them as desired.

The defendant put in evidence, from the descriptive catalogue of the Florida steam boiler exhibited to it by the plaintiffs, the recommendations of the radiator. Among these recommendations were, that it would carry steam continuously from twelve to eighteen hours without attention, in the coldest weather; that it was self-feeding; that it was more economical of fuel than other radiators; and that one man could easily give it all the attention required in a quarter of an hour at evening and the same time in the morning. Also, from the same pamphlet, the printed instructions as to the management of the heater, the only one of which instructions containing a direction or suggestion as to what kind of coal should be used, being these words in very large letters: "Use stove coal." Among the instructions was, that when steam was required at the radiators the valves should be open to their full capacity, and when not required, tightly closed; that a valve half open would cause the radiator to fill with water.

The testimony for the defendant tended to show the following: The heating apparatus put in by plaintiffs

was not sufficient to keep the arcade, dining-room and parlors up to the degree of heat contracted for, but coal fires had to be used in addition, especially in the dining-room, and at considerable expense. The dining-room is cut off from the arcade by sliding doors. It was not intended when the hotel was built that the halls should be closed up; there is no provision made for it in its construction, and it was never agreed with plaintiffs that the halls should be closed. For a month or so after the system of heating was put in by the plaintiffs hot water could be obtained, but since that time and until changes were made by defendant it could not be, except in the most insufficient quantities. The trouble with the steam-heating system put in by the plaintiffs was not that proper fuel was not used or proper attention given, but that the heater was entirely too small to do the work agreed. The steam pipes leaked from the registers in the dining-room until the water dripped through the ceiling to the floor below. The bills for extra work were too large. In order to perfect the system of heating and of furnishing hot water, defendant has had to incur large expense. A plumber who engaged to do a job, the object of which is to furnish hot water, should know beforehand, and should probably state before a job was turned over, whether or not the hot water boilers were of sufficient capacity. The system for obtaining hot water was changed by defendant after it was found that hot water in sufficient quantities was not to be obtained under the system as at first used in connection with plaintiffs' contract, but no greater heating surface was used, nor hot water boilers of greater capacity, and when the change was made a sufficient supply of hot water was obtained. The charges for extra work are unreasonable to the extent of $250, and the heating apparatus as furnished by plaintiffs, taking into consideration the annoyance

and extra expense caused by it, is worth $1,000 less than that contracted for.

The jury found for the plaintiffs $2,591.63, and also set up the lien claimed. For the grounds of the motions in arrest of judgment and for a new trial see the opinion.

Dabney & Fouché, for plaintiffs in error

J Branham, by brief, contra.

Simmons, Justice.

1. The facts in this case will be found in the official report. Under these facts the trial judge did not err in overruling the motion in arrest of judgment set out in the bill of exceptions. A part of the lien claimed on the hotel by the defendants in error, was for extra work for which no price had been agreed upon by the parties. The plaintiffs in the court below claimed a lien for $2,691.63. This included the work and material specified in the written contract, and extra work and material for which there was no written contract and no agreed price. The jury found a verdict for $2,591.63, one hundred dollars less than the amount claimed by the plaintiffs in the court below. The defendant in the court below moved in arrest of judgment for this reason, claiming that, the jury having found less than the plaintiffs claimed, the verdict showed that the plaintiffs had not fully complied with their contract and therefore were not entitled to a lien. This might be true, perhaps, if the whole amount had been fixed in the written contract, but as only a part of it was fixed therein, and as the remainder was for extra work as to which there was no agreed price, and as the parties differed in their testimony in regard to what the price should be, the fact that the jury found less than was claimed for the extra work did not deprive the plaintiffs of their lien. There was, therefore, no error in refusing to arrest the judgment on this ground.

2. The fourth ground of the motion for a new trial complains that the court erred in charging the jury as follows: "If it was the contract that the hotel company was to close up the halls by storm-doors, and if the hotel company failed to close up the halls, and if there was a failure to produce the proper degree of heat, by reason of such neglect to put in storm-doors, then the plaintiffs would not be responsible for the failure, if it was caused by the failure to close up the halls." This charge is alleged to be error, (1) because parol testimony will not be received to vary a written contract; and (2) because if there was such a contract as to closing the halls with storm-doors, it was merged in the written contract.

The general rule is, that parol testimony will not be received to vary the terms of a written contract, and that all the agreements and negotiations are merged in the written contract; but under the facts disclosed in this record, we do not think the court erred in giving this instruction to the jury. The record discloses that the plaintiffs in the court below did not introduce or bring into the case anything as to the closing of the halls, but that it was first brought out by counsel for the defendant, on his cross-examination of Bartow Warlick, one of the witnesses for the plaintiffs; and no objection was made to the testimony and no motion to exclude it, so far as appears from the record. And from the examination of this witness and others, it seems to have been made an issue in the case as to whether the contract was that the halls should be closed with storm-doors. The issue having been made by the testimony, and no objection being made to it and no motion to exclude it, it was the right and the duty of the court to instruct the jury upon it.

. 3. The 5th ground complains that the court charged the jury as follows: "If the plaintiffs quit the extra

work for fear that they would not get their pay, they had the right to do so, and a failure to complete the extra work for that reason would not defeat their lien." Under the evidence disclosed by the record, we think the court erred in giving this charge. We do not think the law allows a contractor, mechanic and material-man to violate a contract and claim a lien for work done, because of an apprehension or fear that he will not receive his pay. So far as disclosed by the evidence, the defendant in the court below had not, at the time the plaintiffs quit the work, failed or refused to pay them therefor. If the contract had been that the defendant was to pay them by the day or the week or the month, and the defendant had failed to make the payment when due, then perhaps the plaintiffs would be justified in stopping work, and would be authorized to claim a lien for the work already done; but upon a mere apprehension or fear that they would not be paid at the time for payment, we do not think they could quit work and claim a lien. Before a lien upon real estate can be established, the code, §1990, requires that there shall be "a compliance with his contract by the person claiming the lien." The plaintiffs having failed to complete their contract as to the extra work, simply on account of the fear that they would receive no compensation therefor, they are not entitled to a lien for so much of the extra work as they have done, but as to such work are merely entitled to a general judgment upon a *quantum meruit;* and this only because the defendant received the benefit of the work. So far, therefore, as the verdict sets up a special lien for this extra work, it is erroneous, and to that extent the lien should be discharged. To ascertain this amount we have made a calculation based upon the figures set out in the record, and we find that to the extent of $553.41, the verdict sets up a lien on account of extra work and material. As we have seen, the verdict

is for $2,591.63, this being a balance reached after deducting payments to the amount of $2,356.98 credited by the plaintiffs on their account before this suit was brought. The aggregate account, therefore, so far as the jury found it to be correct, amounted to $4,948.61. Of this, the part which came within the written contract (to wit, heating system, $1,452.00, closets and plumbing, $1,508.50 and $322.00, and gas-pipe at 10 cents per foot, $609.40) amounted to $3,891.90; leaving the amount of $1,056.71, which must have been allowed for work and material outside of the written contract. As above stated, before the account was sued, payments to the extent of $2,356.98 were made thereon; and these payments should be prorated between that part of the account which came within the written contract, and that part which the jury recognized as correct for extra work and material. Thus apportioning the payments, it will be seen that of the aggregate balance for which the jury set up a lien, to wit, $2,591.63, the sum of $553.41 must be the proportion of the balance found to be due for extra work and material; and as already said, the verdict was to this extent improper. We therefore reverse the judgment in this case, unless the defendants in error will write off and discharge their special lien for the $553.41. If they will do this within thirty days after the judgment of this court is made the judgment of the superior court, the case will stand affirmed.

4. As to the 1st, 2d and 3d grounds of the motion, which are the usual ones that the verdict is contrary to law, evidence, etc., we will say that the evidence appears to be conflicting upon the points made in the pleadings; and the trial judge being satisfied with the finding of the jury upon these issues, we will not interfere with his discretion in overruling the motion on these grounds.

*Judgment reversed, with direction.*